J-S14012-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES ELIJAH DICKSON | : | |
| | : | |
| Appellant | : | No. 3072 EDA 2017 |

Appeal from the Judgment of Sentence May 24, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004796-2016,
CP-51-CR-0004797-2016, CP-51-CR-0004798-2016,
CP-51-CR-0004799-2016, CP-51-CR-0004800-2016,
CP-51-CR-0004801-2016, CP-51-CR-0004802-2016

BEFORE:   LAZARUS, J., NICHOLS, J., and PELLEGRINI*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 23, 2019**

James Elijah Dickson appeals, *pro se*, from his judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after he was found guilty of three counts of first-degree murder,[1] two counts of attempted murder,[2] two counts of aggravated assault on a police officer,[3] two counts of aggravated assault,[4] four counts of simple assault,[5] two counts of recklessly

---

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 901.

[3] 18 Pa.C.S. § 2702(a)(6).

[4] 18 Pa.C.S. § 2702(a).

[5] 18 Pa.C.S. § 2701.

---

\*   Retired Senior Judge assigned to the Superior Court.

endangering another person (REAP),[6] and one count each of possessing a firearm (prohibited)[7] and possessing an instrument of crime (PIC).[8] Dickson was sentenced to three consecutive life sentences for the murder convictions.[9] After careful review, we affirm.

The trial court aptly summarized the facts underlying the instant case as follows:

> During the evening of April 16, 2016, [Dickson] was hanging out at the home of his cousin, Alphonso Liverpool. Also at the home were Ziyon Laboy, Levi Almonte, Joel Almonte, Edwin Laboy, and Christine Chromiak. At some point, the group decided to walk over to [Dickson's] home at 637 East Westmoreland Street in Philadelphia. Along the way, they ran into Kenny Stowe. [Dickson] told Liverpool that he did not want Stowe to come over, and threatened that if Stowe did, he would kill Stowe and Liverpool. However, Stowe remained persistent about going to [Dickson's] home with the group, so [Dickson] eventually relented and allowed Stowe to come over.
>
> Once at the home, the group ate, drank alcohol, and smoked marijuana and PCP. Stowe began to argue with [Dickson], so [Dickson] ejected Stowe from his home; however, [Dickson] allowed Stowe to return approximately twenty minutes later.

---

[6] 18 Pa.C.S. § 2705.

[7] 18 Pa.C.S. § 6105.

[8] 18 Pa.C.S § 907.

[9] The court also sentenced Dickson to concurrent terms of 20-40 years in prison for attempted murder of one victim, 10-20 years' imprisonment for attempted murder of another victim, two terms of 4-8 years in prison for the aggravated assault of two police officers, 5-10 years in prison for the possession of a firearm by a prohibited person charge, and 1½-3 years' imprisonment for the PIC charge. Due to merger, Dickson was not sentenced on the aggravated assault, simple assault, or REAP convictions.

Once Stowe returned, he again argued with [Dickson], prompting [Dickson] to eject Stowe from his home a second time; however, like before, [Dickson] allowed Stowe to eventually reenter the home.

At some point, a transgender individual came over, and [Dickson] went upstairs with the individual. After the individual left, Stowe told [Dickson] to "stop messing with boys," and called [Dickson] a faggot. [Dickson] then told Liverpool to get Stowe out of his home, or he would kill them both. At the time, [Dickson] had a shotgun in his hand and proceeded to point it in Liverpool's direction and pull the trigger; however, it was not loaded. [Dickson] then asked Liverpool and Joel Almonte to come upstairs with him, and there, Almonte admitted to unloading the shotgun earlier that evening because he felt unsafe in the home with the loaded gun. Almonte then went back downstairs, but Liverpool remained upstairs with [Dickson]. While the pair was upstairs, [Dickson] told Liverpool that the people downstairs were trying to kill him. Liverpool tried to convince [Dickson] otherwise, and eventually told him that he would go downstairs to see what was going on. Once downstairs, Liverpool warned Stowe that they had to leave immediately, but Stowe refused to leave, so Liverpool left alone.

After Liverpool left, [Dickson] walked down the stairs with the shotgun, and shot Stowe, who was standing in the living room, in the head. Ziyon Laboy ran to the door; however, before he escaped, [Dickson] shot him twice in the arm. [Dickson] next shot Edwin Laboy, who was also in the living room at the time, in the head. After seeing [Dickson] shoot Edwin Laboy, Levi Almonte made his escape through the front door. Joel Almonte and Christine Chromiak ran into the kitchen and hid in two different corners. [Dickson] followed the pair into the kitchen with the shotgun in his hands, and eventually pointed the gun at Almonte. Almonte thereafter smacked the gun and ran away from the scene. After Almonte escaped, [Dickson] shot Chromiak three times.

After the shootings concluded, [Dickson] called 911. While he remained on the line with the authorities, he barricaded himself in his home when police arrived. Police therefore secured the perimeter and called in the SWAT team. While members of the SWAT team were on the roof of [Dickson's] home, [Dickson] shot through the roof at them. Eventually, [Dickson] exited his home without incident and was taken into custody. Once [Dickson] had

- 3 -

left the home, officers entered the premises and found the bodies of Stowe, Edwin Laboy, and Chromiak. In addition, police recovered numerous spent shotgun casings and a camouflage - printed shotgun at the scene, as well as unspent shotgun casings on [Dickson's] person.

Trial Court Opinion, 1/17/19, at 4-6 (citations to notes of testimony omitted).

After a three-day bench trial, Dickson was convicted of the above-stated offenses and, on May 24, 2017, the court sentenced him to the above-mentioned penalties. Dickson filed timely post-trial motions on May 25, 2017; the court denied the motions on September 11, 2017. Dickson filed a timely notice of appeal and *pro se* Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[10] Dickson presents the following issues for our consideration:

(1)   The prosecutor did not present the forensic testing results and the physical evidence at [Dickson's] trial.

(2)   The crime scene unit[] staged a false crime scene.

(3)   The medical examiner[] reported false autops[y] reports.

_____

[10] On September 19, 2017, Dickson filed a direct appeal from his judgment of sentence. On October 6, 2017, the trial court asked this Court to remand the matter for a *Grazier* hearing to determine whether Dickson sought to proceed *pro se* on appeal. *See Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998). Our Court complied with the request and remanded the case; the trial court held a hearing on December 22, 2017, where Dickson stated that he wanted to remain counseled. The Defender Association, however, subsequently sought and was granted leave to withdraw. As a result, the court appointed new counsel, Earl G. Kauffman, Esquire, to represent Dickson on appeal. Attorney Kauffman, however, filed a statement of his intent to file an *Anders*/*McClendon* brief and Dickson subsequently requested to proceed *pro se*. Accordingly, this Court remanded the matter for a second *Grazier* hearing, which the trial court held on June 22, 2018. The trial court determined that Dickson's waiver of counsel was knowing, intelligent, and voluntary.

(4) Did the prosecution witness "Joel Almonte['s]" testimony establish[] that [Dickson's] thought[]s were without an intentional killing [] and [made without] . . . malice or a specific intent to kill?

(5) Was [the] trial judge fact finding [and] clearly erroneous[] when [he] found [Dickson] guilty[] of first-degree murder?

Appellant's Brief, at 3-4.

We first note that Dickson has waived issues four and five by failing to include them in his July 17, 2018 *pro* se Rule 1925(b) concise statement of errors complained of on appeal.  **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); **see also Commonwealth v. Hansley**, 24 A.3d 410 (Pa. Super. 2011) (Dickson waived certain issues on appeal when not raised in Rule 1925(b) statement).

In his first issue, Dickson claims that the prosecution withheld physical evidence that was submitted to criminologists for forensic DNA testing. Specifically, he says that a swab for DNA from the shotgun used to shoot the victims, a swab of blood from the step outside of the home where the victims were found, and used and unused shotgun shells were not presented at trial. He asserts that this evidence was material and, thus, constitutes a **Brady**[11] violation.

To establish a **Brady** violation, a Dickson must demonstrate:

(1) the prosecution concealed evidence; (2) the evidence was either exculpatory or impeachment evidence favorable to him; and (3) he was prejudiced.  To establish prejudice, [a Dickson]

_____

[11] **Brady v. Maryland**, 373 U.S. 83 (1963).

- 5 -

must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Impeachment evidence, which goes to the credibility of a primary witness against the accused, is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness.

*Commonwealth v. Packer*, 146 A.3d 1281, 1289 (Pa. Super. 2016) (citations omitted).

In his brief, Dickson lists three questions at the end of his argument section on the *Brady* issue. Those questions concern whether he was deprived of the testing results, whether this material evidence had probative value and whether the prosecutor intentionally withheld potentially exculpatory physical evidence. *See* Appellant's Brief, at 17. Dickson states, "If [you] answer, Yes, to any question above[, then the] Appellant is entitled to relief." *Id.* at 18. Dickson has clearly failed to not only allege the elements necessary for a successful *Brady* claim, but offers nothing to support an argument that the prosecution actually concealed the evidence, that the evidence was actually exculpatory or favorable to him, or that he was actually prejudiced. *Packer*, *supra*. Thus, his claim fails.

In his final two issues, Dickson contends that the crime scene unit staged a false crime scene and that the medical examiner crafted false autopsy reports. Dickson's entire argument on these issues consists of the following statement: "[T]he crime scene unit, and the medical examiner were with [sic] intent to impair, and mislead with documents knowing it [sic] to be false." Appellant's Brief, at 24. Dickson appends several copies of crime scene

photos and medical examiner reports of two of the victims in an apparent attempt to note inconsistencies between the photos and the findings.

At trial, Dickson testified that he "believe[s]" he shot two of the victims two times each. N.T. Trial, 5/24/17, at 8. When the assistant district attorney noted that the medical examiner testified that one of those victims was shot four times, and asked Dickson whether he thought the medical examiner was wrong, he replied, "I would say no, sir." *Id.* at 9. Doctor Lindsay Simon, Philadelphia Associate Medical Examiner and an expert witness in the field of forensic pathology, performed the post-mortem autopsies on two of the three victims. The trial court notes that, in its fact-finding role, it chose to credit Dr. Simon's testimony that detailed the victim's various injuries over that of Dickson, including Dr. Simon's testimony that the female victim was shot three times. *See* N.T. Trial, 5/22/17, at 10-49 (testimony on direct examination). The court also heard the testimony of a firearms examiner who testified regarding the maximum capacity of a shotgun; Dickson specifically stated that he did not dispute the examiner's testimony. N.T Trial, 5/24/17, at 12.

Whether Dickson shot the female victim two or three times does not translate into a "doctored crime scene" or "false reports." The bottom line is that Dickson admitted he shot the victims multiple times, and that no one else in the residence fired the shotgun. The court did not believe Dickson's self-serving testimony that consisted of a claim of self-defense. *See Commonwealth v. Sanchez*, 36 A.3d 24, 39 (Pa. 2011) ("The finder of fact . . . exclusively weighs the evidence, assesses the credibility of witnesses, and

- 7 -

may choose to believe all, part, or none of the evidence.").  Thus, we find no merit to Dickson's final two issues.

Judgment of sentence affirmed.[12]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/23/19

---

[12] We, herein, deny Dickson's motion for remand.